IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JEFF J. DAILY,

      **Plaintiff,**

      vs.                                                           Civ. No. 12-94  ACT

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Reverse or Remand Administrative Decision and Memorandum in Support of Plaintiff's Motion to Reverse or Remand Administrative Decision of the Plaintiff Jeff J. Daily ("Plaintiff"), filed July 8, 2012, 2011 [Docs. 22 and 23].  The Commissioner of Social Security ("Defendant") filed a Response on September 10, 2012 [Doc. No. 24], and Plaintiff filed a Reply on September 23, 2012 [Doc. No. 25].  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that the motion to remand is well taken and it will be GRANTED.

## I.  PROCEDURAL RECORD

On February 19, 2008, Plaintiff protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. [Tr. 152.]  He alleged a disability since October 1, 2007, due to bipolar disorder I and hernia. [Tr. 78.]  His application was initially denied on May 19, 2008, and denied again at the reconsideration level on August 1, 2008. [Tr. 72, 78.]

The ALJ conducted a hearing on October 15, 2009. [Tr. 33-69.] At the hearing, Plaintiff was represented by Attorney Patricia Glazek. On February 24, 2010, the ALJ issued an unfavorable decision. In his report, the ALJ found that the claimant has the following severe impairments: obesity, bipolar disorder, and anxiety. [Tr. 21.] The ALJ also found that the claimant has the following non-severe impairments: asthma, chronic obstructive pulmonary disorder, hernia, esophageal reflux, and alcohol abuse in remission. [Id.] The ALJ concluded, however, that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 303, Subpart P, appendix 1. [Id.] The ALJ determined that the claimant has the residual functional capacity to perform light work as defined in CFR 416.967(b) except that the claimant is limited to non-complex tasks and must work with things more than people. [Tr. 22.] In considering the claimant's age, education, work experience, and residual functional capacity, the ALJ established that there are jobs that exist in significant numbers in the national economy that the claimant can perform. [Tr. 26.] The ALJ specifically mentioned occupations such as janitorial cleaner, an assembler, and a packager. [Tr. 27.]

On December 8, 2011, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On January 31, 2012, the Plaintiff filed her Complaint for judicial review of the ALJ's decision.

Plaintiff was born on October 24, 1965. [Tr. 130.] He has a high school education and some college. [Tr. 37.] He has worked as a cook and laborer. [Tr. 167.] He has not engaged in substantial gainful activity since December 29, 2007. [Tr. 166.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208,

---

[1]  Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

1214 (10th Cir. 2004) (quotation omitted).  Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, *quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff was 42 years old at the time he applied for SSI.  In applying for SSI, Plaintiff indicated his medical problems to be bipolar disorder and hernia. [Tr. 166.] He also reported that he suffered with severe mood swings, lack of concentration, lack of motivation, trouble dealing with other people/interpersonal relationships, suicidal ideation, past suicide attempt, unable to lift and carry objects, and difficulty sleeping. [Id.]

#### A.    **Healthcare for the Homeless**

Plaintiff moved to New Mexico in late 2007.  He had recently suffered the loss of his wife and father, became homeless, and was living in a tent. [Tr. 157, 238.]  Plaintiff first sought medical care at Healthcare for the Homeless in November 2007 where Dr. James Lutz initially diagnosed Plaintiff with, *inter alia*, depression. [Tr. 238-241.] Dr. Lutz prescribed the antidepressant Celexa. [Tr. 240.]  On December 19, 2007, Dr. Lutz noted that Plaintiff had been newly diagnosed with bipolar I disorder. [Tr. 234.] Plaintiff continued to receive medical treatment at Healthcare for the Homeless through February 2009.  On January 8, 2009, Dr. Lutz assessed Plaintiff as having rapid cycling bipolar disorder I. [Tr. 402.]

**B.     The Life Link**

Contemporaneous with the medical care Plaintiff received at Healthcare for the Homeless, Plaintiff was also receiving psychiatric treatment, psychotherapy and case management services at The Life Link in Santa Fe, New Mexico.  On December 26, 2007, Psychiatrist Dr. Jafet Gonzales evaluated the Plaintiff and diagnosed Plaintiff as having bipolar, mixed, with an estimated GAF of 54.[2]  [Tr. 284-85.] Dr. Gonzalez initially prescribed Abilify and Depakote. [Id.]  Plaintiff saw Dr. Gonzalez 19 times between January 2008 and February 2009.  [Tr. 452-65, 506-09, 534.] Over the course of these visits, Plaintiff's mood ranged from euthymic to dysphoric. [Id.] Plaintiff predominantly exhibited decreased attention and concentration, and his memory was slightly impaired. [Id.] On many occasions Plaintiff reported crying episodes, mood swings, and death wishes. [455, 461, 463-65, 509, 534.] Because Plaintiff experienced a number of side effects from the various medications prescribed by Dr. Gonzalez,[3] *i.e.*, crying, tremors, dry mouth, weight gain and lightheadedness, his medications were routinely being adjusted and changed. [Tr. 454-459, 461-62, 464-65, 507, 565-566.]  In August 2009, Plaintiff was seen at The Life Link by Psychiatrist B. Badillo Castro. [Tr. 563.] Plaintiff reported having two or three manic episodes every month. [Id.] Dr. Castro assessed Plaintiff with bipolar affective disorder, not controlled, and added Seroquel to his medications. [Id.]

Plaintiff attended psychotherapy sessions at The Life Link with Nicholas Brown, L.M.H.C., from January 2008 to September 2009. [Tr. 357, 365, 430-51, 468-70, 475, 480, 483,

---

[2]     The GAF is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning."  Diagnostic & Statistical Manual of Mental Disorders, 5th ed. (1994) ("DSM-IV"), p. 32. Individuals with a GAF between 50 and 55 experience moderate to serious symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks; suicidal ideation, severe obsessional rituals, frequent shoplifting), or any moderate to serious difficulties in social, occupational, or school functioning.  *Id*.

[3]     During the course of his treatment with Dr. Gonzalez, Plaintiff was prescribed Abilify, Depakote, Wellbutrin, Lorazapam, Lithium, Topamax, and Trazadone.  [Tr. 454-459, 461-62, 464-65, 507, 565-566.]

486, 503, 517, 520, 524, 527, 536-62.] Throughout the course of these sessions, Plaintiff discussed any number of issues including his general health, anger management, family relationships, spiritual issues, and self-esteem. [Id.] More significantly, Plaintiff discussed his bipolar condition, his mood swings, and his challenges with medication. [Id.] In February 2009, Plaintiff reported having "crashes" every two months or so, and manic "highs" once per month. Plaintiff often missed appointments due to his depression. [Tr. 536-37, 540, 544, 546, 555.]

Plaintiff also received case management assistance from The Life Link. This included assisting Plaintiff in obtaining a bus pass, filling out forms for public assistance, accessing no-cost prescription drugs, and pursuing his SSI disability benefits. [Tr. 351, 354, 466, 471, 484-85, 487-88, 510.] Licensed Social Worker Wesley Sandel was assigned as the Plaintiff's case worker and met with Plaintiff three times each week until May 2008. [Tr. 51.] Mr. Sandel left The Life Link in May 2008, but continued to monitor Plaintiff once a week thereafter. [Tr. 53.] Mr. Sandel testified at the October 15, 2009, hearing on Plaintiff's behalf. [Tr. 51, 196-202.] He stated that he had been trying for several months to help the Plaintiff establish a routine in which he left his home, but he had not been successful. [Tr. 53-54.] Mr. Sandel also had encouraged Plaintiff to attend senior citizen luncheons with him, but Plaintiff was very uncomfortable and reluctant to attend. [Tr. 55.] Mr. Sandel testified that in the two years he had known Plaintiff, he had not seen Plaintiff when he was free of depression or mania. [Tr. 57.] He assessed that Plaintiff was functional only about 30-40% of the time. [Id.] Mr. Sandel stated that Plaintiff had difficulty following even simple instructions or completing simple tasks; that he would have difficulty interacting with supervisors and coworkers; that he responds very poorly to stress; and that even simple tasks or decisions would cause a lot of anxiety for Plaintiff. [Tr. 57, 60-61.]

    C.    **Robert Krueger, Ph.D.**

On April 18, 2008, Plaintiff was referred by Disability Determination Services to Dr. Robert Krueger, Ph.D., for a "clinical interview with psychosocial history and mental status examination, Wechsler Adult Intelligence Scale - III (WAIS-III), [and] review of documents." [Tr. 243.] Dr. Krueger's diagnostic impressions were as follows:

| | |
|---|---|
| Axis I: | Bipolar Disorder NOS, most recent episode Unspecified |
| | Cognitive Disorder NOS |
| | Alcohol Abuse, reported to be in Remission |
| Axis II: | Diagnosis deferred |
| Axis III: | Diagnosis deferred; see medical records |
| Axis IV: | Psychosocial stressors appear to be at least moderate |
| Axis V: | Global Assessment of Functioning (GAF): 45-55[4] |

[Tr. 348.]

Dr. Krueger summarized as follows:

> . . . [Plaintiff] appears to be relatively stable on his current medications. . . . Concerning his cognitive functioning, Mr. Daily does have significant problems with visual motor processing speed and has mild impairment with concentration and memory skills. He probably does qualify for having a cognitive disorder NOS. . . .
>
> The results of the current evaluation indicate that Mr. Daily does have significant functional impairment now. Because of the erratic behavior associated with having bipolar disorder, he may have anywhere from mild to severe impairment with understanding, remembering, and following simple or complex work instructions. The current tests results also suggest moderate to severe impairment with maintaining pace and persistence. Mr. Daily also is likely to have moderate to severe impairment with adjusting to changes in work environments. Because of mood fluctuations associated with bipolar disorder, he may have anywhere from mild to severe impairment in work relationships. . . . Because of having impaired judgment ability associated with bipolar disorder, he may have anywhere from mild to severe impairment with being aware of and reacting appropriately to dangers in work environments. These clearly are long-term problems, which can be expected to persist for more than one year.

[Tr. 248.]

---

[4] Individuals with a GAF of 41 - 50 experience a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.*

### D.     Elizabeth Chiang, M.D.

State Agency physician Elizabeth Chiang used the Psychiatric Review Technique Form to evaluate Plaintiff's mental impairments. [Tr. 252-269.] She evaluated Plaintiff under Listings 12.02 (Organic Mental Disorders - Cognitive Disorder NOS), 12.04 (Affective Disorders - Bipolar Disorder I) and 12.09 (Substantive Addiction Disorders). [Tr. 252.]  Dr. Chiang determined that in activities of daily living, Plaintiff has mild restriction. [Tr. 262.]  In social functioning, Plaintiff has moderate difficulties. [Id.]  With regard to concentration, persistence, or pace, Plaintiff has moderate difficulties. [Id.] Finally, Dr. Chiang indicated that Plaintiff had had no episodes of decompensation. [Id.] Dr. Chiang concluded as follows:

> Claimant can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

[Tr. 268.] A subsequent reviewer, W. Miller Logan, M.D., affirmed the assessment.

### IV.  DISCUSSION

**Failure to Consider Cognitive Disorder NOS**

#### a.     Disability Analysis

Plaintiff asserts that the ALJ erred by failing to consider Plaintiff's cognitive disorder NOS and borderline IQ in his disability analysis.  [Doc. 23 at 18.]  Plaintiff argues there is evidence that Plaintiff's cognitive disorder is a severe impairment because Plaintiff's WAIS-III test yielded a valid Performance IQ of 80. [Id.]  Plaintiff relies on *Hunt v. Massanari*, 250 F.3d 622, 624 (8th Cir. 2001), wherein the court affirmed that borderline intellectual functioning should be considered a severe impairment. [Id.]   "Borderline intellectual functioning describes individuals with an IQ between 71 and 84."  *Hunt*, 250 F.3d at 624 (quoting *Thomas v. Sullivan*,

876 F.2d 666, 668 n.1 (8th Cir. 1989)). [Id.]  Plaintiff further argues that the ALJ's omission of Plaintiff's cognitive disorder in his hypothetical to the vocational expert was legally insufficient and prejudicial. [Id. at 19.]  Defendant contends that at no time was Plaintiff diagnosed with nor did he allege a disability based on borderline intellectual functioning. [Doc. 24 at 5.] Defendant further contends that the ALJ accounted for any limitations with respect to cognitive disorder in his RFC finding and hypothetical question posed because he limited Plaintiff's RFC to non-complex tasks. [Id.]

The Listing of Impairments describe impairments that are considered severe enough to prevent a person from performing any gainful activity.  20 C.F.R. §§ 404.1525(A), 416.925(A).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  When a claimant for disability benefits presents evidence of a mental impairment, the Commissioners must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listings.  *Cruse v. United States Dept. of Health & Human Serv.*, 49 F.3d 616-17 (10th Cir. 1995).  This procedure involves two parts.  Under Part A, the Commissioner determines "whether certain medical findings which have been found especially relevant to the ability to work are present or absent."  20 C.F.R. § 404.1520a(b)(2).  Under Part B, the Commissioner "rate[s] the degree of functional loss resulting from the impairment(s)."  *Id*. at § 404.1520a(c)(3).  The Listings subsections applying to mental disorders enumerate criteria that guide the Commissioner through Parts A, B and C for a given disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 12.02-12.08.

Here, the ALJ only evaluated Plaintiff's mental impairment under Listing 12.04 based on Plaintiff's diagnosed bipolar disorder.  The ALJ failed to consider Plaintiff's diagnosis of

cognitive disorder NOS under Listing 12.02. This is error. *See Murdock v. Astrue*, 2012 WL 104878 (10th Cir., Jan. 13, 2012) (unpublished) (finding that ALJ erred by not discussing evidence or making findings to support conclusion that certain impairment did not meet listing.) "A step three error, such as the one in this case, does not automatically require remand." *Id.* The Court must consider whether the ALJ's findings "conclusively preclude Claimant's qualification under the listings at step three" such that "no reasonable factfinder could conclude otherwise." *Id.*, *quoting Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005). If "there are no findings that 'conclusively negate the possibility' that a claimant can meet a relevant listing, *see id.*, we must remand to the ALJ for further findings." *Id.*, *see Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

The Tenth Circuit's decision in *Fischer-Ross* supports the conclusion that the ALJ committed error in this case. In *Fischer-Ross*, the question before the Circuit Court was whether *Clifton* required reversal "where the ALJ's factually substantiated findings at steps four and five of the evaluation process alleviates any concern that a claimant might have been adjudged disabled at step three." *Fischer-Ross*, 431 F.3d at 730. Because the ALJ made substantial findings at step four in *Fischer-Ross*, the Tenth Circuit declined to review an ALJ's conclusory determination at step three in an isolated manner separate from the rest of the ALJ's decision. *Id* at 734, n.5 (internal citations omitted). In *Fischer-Ross*, the Court further explained that the ALJ's findings at steps four and five, "coupled with indisputable aspects of the medical record," defeated any notion that the claimant met listing requirements. *Id.* at 735. Thus, in that case, the Tenth Circuit concluded that any error by the ALJ at step three was harmless.

Here, in contrast to *Fischer-Ross*, the ALJ's step four findings are more akin to the sparse findings in *Clifton*. Unlike the facts in *Fisher-Ross*, the ALJ's discussion at step four does not

conclusively preclude claimant's qualification under the listings at step three such that no reasonable factfinder could conclude otherwise. In his decision, the ALJ merely noted that Plaintiff had been assessed with cognitive disorder. While the Defendant argues that the ALJ sufficiently accounted for any limitations with respect to cognitive disorder by limiting Plaintiff's RFC to non-complex tasks, this does not rise to the level of factually substantiated findings at steps four and five to alleviate any concern that Plaintiff might have been adjudged disabled at step three. Therefore, the Court must remand for further findings. *See Murdock,* 2012 WL 104878; see *Clifton,* 79 F.3d at 1009.

Furthermore, the ALJ's findings at step 4 are *not* "coupled with indisputable aspects of the medical record" to defeat any notion that the Plaintiff met the listing requirements. At step 4, the ALJ failed to discuss why he disregarded substantial evidence in his findings as to the B criteria under Listing 12.04. Pursuant to the B criteria under this listing, the claimant's mental impairment must result in at least two of the following to meet the required degree of functional loss that is incompatible with the ability to do any gainful activity:

    1.    Marked restriction of activities of daily living; or
    2.    Marked difficulties in maintaining social functioning; or
    3.    Marked difficulties in maintaining concentration, persistence, or pace; or
    4.    Repeated episodes of decompensation, each of extended duration [.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04(b).

With respect to the B Criteria, the ALJ wrote:

> In activities of daily living, the claimant has mild restriction. The claimant is able to care for his personal needs, handle his finances, live alone, and shop.[5]
>
> In social functioning, the claimant has moderate difficulties. The claimant testified that he is shy and does not get along well with supervisors and co-workers[6].
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant testified that he has trouble staying on task and he was observed to lose his focus.[7]
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been for extended duration..[8]

---

[5]  Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. 20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[6]  Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers. 20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[7]  Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence. 20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[8]  Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The ALJ concluded that because claimant's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," the paragraph B criteria were not satisfied. [Tr. 22.]

The ALJ also, in conclusory fashion, found that Plaintiff's limitations did not meet the C criteria.[9] *Id.*

In assessing Plaintiff with mild or moderate difficulties, the ALJ relied on selective portions of Plaintiff's subjective testimony, along with the State agency nonexamining physician Dr. Elizabeth Chiang's assessment of Plaintiff's functional limitations. However, the ALJ disregarded or ignored significantly probative evidence that contradicted that evidence. The Court recognizes that the ALJ need not discuss every piece of evidence in the record, but the record must demonstrate that the ALJ considered all of the evidence. In other words, in addition to discussing the evidence supporting his decision, the ALJ also must also discuss "the

---

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence. 20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[9] The C criteria under Listing 12.04 is: "Medically documented history of a chronic affective disorder for at least 2 years duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

20 C.F.R. Pt. 404, Subpt. P, App.1, 12.04C.

uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1010.

In finding mild to moderate limitations with respect to the B criteria, the ALJ's analysis omits discussion of the following significant probative evidence: (1) Plaintiff was homeless and living in a tent at the time he made his SSI application, and it was only with the assistance of social workers that he was able to move into subsidized housing where he is watched over [Tr. 352-53];  (2) Plaintiff's "cooking" consists of making sandwiches and opening canned goods [Tr. 159]; (3) Plaintiff indicates he can shop for his groceries, but it takes him all day to do so [Tr. 160]; (4) Licensed Social Worker Wesley Sandel testified that Plaintiff was unable to complete a grocery shopping task that included purchasing only four or five grocery items [Tr. 58]; (5) Plaintiff has run out of food because he poorly manages his food stamp allocations [Tr. 371, 477]; (6) Plaintiff's ability to care for his finances is limited to counting change [Tr. 160]; (7) Plaintiff required assistance from The Life Link social workers to pursue his Social Security benefits, obtain a bus pass, fill out forms for public assistance, and access no-cost prescription drugs [Tr. 351, 354, 466, 471, 484-85, 487-88, 510]; (8) Plaintiff was examined and diagnosed by Dr. Robert Krueger with bipolar disorder NOS and cognitive disorder NOS. Dr. Krueger summarized that because of Plaintiff's bipolar disorder, his functional impairment could be anywhere from mild to *severe* depending on where he is in his bipolar cycle [Tr. 248]; and (9) Both Dr. Krueger and Dr. Gonzalez assessed Plaintiff with a GAF ranging between 45-55, which indicates a major impairment in areas such as work, judgment, thinking or mood.

In finding no episodes of decompensation, the ALJ's analysis omits any discussion of the following significant probative evidence: (1) On January 8, 2009, Dr. James Lutz, who treated Plaintiff over the course of two years and saw him on 16 different occasions, diagnosed Plaintiff

with rapid cycling bipolar disorder, which indicates four or more episodes of major depression, mania, hypomania, or mixed symptoms within a year[10] [Tr. 402]; (2) Licensed Social Worker Wesley Sandel testified regarding Plaintiff's rapid cycling bipolar disorder, and further stated he had not seen Plaintiff free of depression or mania in the two years he had been seeing Plaintiff [Tr. 55]; and (3) Plaintiff reported to his psychotherapist Nicholas Brown in February 2009 that he was having "crashes" every two months or so, and manic "highs" once per month.

The ALJ did not discuss why he disregarded the above-described findings.

While the ALJ states he gave weight to the State agency's nonexamining source opinion finding as to the claimant's mental impairments, he fails to explain his decision as required by 20 CFR § 416.927(e)(2)(ii).  Unless a treating source's opinion is given controlling weight, opinions of nontreating sources, in this case Dr. Krueger, are generally given more weight than the opinion of a nonexamining source who has merely reviewed the records.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004); *Talbot v. Hecker*, 814 F.2d 1456, 1463 (10th Cir. 1987).  "Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."  20 C.F.R. § 404.1527(d).  Those factors include (1) the examining relationship, with generally more weight given to the opinion of a source who has examined you than to the opinion of a source who has not examined you; (2) the treatment relationship, including the length of the treatment relationship and frequency of examination, and the nature and extent of the treatment relationship; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) the consistency of an opinion in relationship to the entire

---

[10]     http://www.nimh.nih.gov/health/publications/bipolar-disorder/index.shtml

record; (5) whether or not the physician is a specialist about the relevant medical issues; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(1)-(6); *see Siegle v. Barnhart*, 377 F. Supp. 2d 932, 940 (D. Colo. 2005) (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (finding that ALJ is required to consider nontreating physician's opinion with regard to "several factors, and to provide specific, legitimate reasons for rejecting it." (Citations omitted.)  Here, the ALJ failed to explain why he gave more weight to the State agency's nonexamining source opinion by discussing the factors described above and giving "specific legitimate reasons for rejecting" Dr. Krueger's opinion.

Finally, with respect to the testimony of Licensed Social Worker Wesley Sandel, the ALJ states he treated it as an opinion statement under SSR 06-03p; however, he failed to explain the weight given to Mr. Sandel's opinion or to ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p explains that if a treating source opinion is not given controlling weight, opinions of *other* medical sources, such as social workers, will be evaluated using the same regulatory factors used for evaluating medical opinions. SSR06-03 (citing 20 C.F.R. §§ 404.1527, 416.927). The evaluation of an opinion from a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case. SSR 06-03p at *3.

In evaluating the evidence from other medical sources, SSR 06-03p states:

> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

SSR 06-03p at *6.

Finally, SSR 06-03p states how an ALJ should explain the consideration given to opinions from other medical sources as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what an adjudicator must explain in the disability determination, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case*.

SSR 06-03p at *6. (Emphasis added.)

Here, the ALJ is required to evaluate the opinion of Mr. Sandel using the same regulatory factors used for evaluating medical opinions. In addition, the ALJ should explain the weight given to the opinion from this "other source," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. SSR 06-03p; 20 C.F.R. §§ 404.1527 and 416.927. Despite the fact that Mr. Sandel had seen Plaintiff consistently for two years, more often than any of his medical providers, the ALJ failed

to explain why his opinion did not outweigh the State agency nonexamining source opinion of Dr. Chiang. This is error.

### b. Hypothetical Question to VE

The rule is well-settled that, where a hypothetical question fails to include "all (and only) those impairments borne out by the evidentiary record," *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995), a VE's testimony in response to it cannot provide substantial evidence to support an ALJ's findings regarding the work a claimant is able to perform. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (holding "hypothetical questions in this context must reflect with precision all of [claimant's] impairments."). Here, the ALJ failed to include any reference to Plaintiff's cognitive disorder or the rapid cycling nature of his bipolar disorder. This is error.

The Court will not address Plaintiff's remaining claims of error. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Decision [Doc. 22] is GRANTED for proceedings consistent with this memorandum opinion.

_____
**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding by Consent**